IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

BASHE ABDI YOUSUF, et al.,            )
                                       )
         Plaintiffs,                   )
                                       )
v.                                     )          1:04cv1360
                                       )
MOHAMED ALI SAMANTAR,                  )
                                       )
         Defendant.                    )

<u>MEMORANDUM OPINION</u>

Plaintiffs, members of the Isaaq clan of Somalia, filed this civil action under the Torture

Victim Protection Act of 1991 ("TVPA"), 28 U.S.C. § 1350 (Note), and the Alien Tort Claims

Act ("ATCA"),[1] 28 U.S.C. § 1350, against Mohamed Ali Samantar ("Samantar"), a former First

Vice President, Minister of Defense, and Prime Minister of the Democratic Republic of Somalia.

In their complaint, plaintiffs allege that Samantar, as the official who was in charge of the

Somalia Armed Forces in the 1980s and 1990s, is liable for acts of torture; extrajudicial killing;

attempted extrajudicial killing; crimes against humanity; war crimes; cruel, inhuman, and

degrading treatment or punishment; and the arbitrary detention of the plaintiffs.  Samantar moves

to dismiss the Second Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(1).

For the reasons stated in open court on April 27, 2007, and more fully set forth below,

Samantar's motion has been granted.

---

[1]This statute is also sometimes referred to as the Alien Tort Statute, or the ATS.

## II. FACTUAL BACKGROUND[2]

Plaintiffs allege that in October 1969, a coup led by Major General Mohamed Siad Barre ushered in an authoritarian socialist rule to Somalia.  Power was assumed by the Supreme Revolutionary Council ("SRC"), which consisted primarily of the Army officers who had supported and participated in the coup, including Samantar.  The SRC suspended the existing Constitution, closed the National Assembly, abolished the Supreme Court and declared all groups not sponsored by the government, including civic or religious groups, to be illegal.  The military leadership also systematically favored its own clans and oppressed other clans.[3]  The military leadership built upon and exploited the clan system by appointing members of favored clans to top governmental and military positions while also oppressing and targeting other clans, especially the Isaaq clan in the northern regions.

Plaintiffs further allege that after Somalia was defeated in the Ogden War with Ethiopia in 1978, the government took increasingly fierce measures against perceived opponents.  Beginning in the early 1980s, the military committed numerous atrocities against ordinary citizens in an attempt deter the growing opposition movements.  Security forces, acting in coordination with or under the control of the Samantar-led military forces, were together responsible for the widespread and systematic use of torture, arbitrary detention, and extrajudicial killing against the civilian population of Somalia.

---

[2] Because this matter comes before the Court on a motion to dismiss, the factual allegations in the complaint are accepted as true and viewed in the light most favorable to the plaintiffs.  See Edwards v. City of Goldsboro, 178 F.3d 231, 244 (4th Cir. 1999).  Accordingly, the following recitation adopts the plaintiffs' version of the events.

[3] Even before Somalia became an independent nation, the clan system served as the fundamental building block of Somali society and attracted great emotional allegiance.

Members of the Isaaq clan, located primarily in the northwestern region of Somalia, were a special target of the government because they were among the best educated and most prosperous Somalis, and therefore perceived as potential opponents to the Barre regime.  In the 1970s, the government relied primarily upon economic measures to weaken the Isaaq clan.  During the 1980s, however, when Samantar was Minister of Defense and then Prime Minister, the government altered its approach and began utilizing the military forces in a campaign to eliminate Isaaq clan opposition.  In response to this campaign, some members of the Isaaq clan established the Somali National Movement ("SNM") in 1981.  In 1983 and 1984, some members of the SNM began a campaign of violent resistance and, operating from bases in Ethiopia, SNM commandos attacked military posts near the northern Somali cities of Hargeisa, Burao, and Berbera.

Plaintiffs allege that in response to the SNM attacks, human rights abuses and war crimes by the Somali military forces increased dramatically.  The Somali National Army initiated a counterinsurgency campaign that disregarded the distinction between civilians and SNM fighters.  It killed and looted livestock, blew up water reservoirs, destroyed homes, tortured and detained alleged SNM supporters, and indiscriminately killed civilians.  These violent confrontations between SNM and the Somali Armed Forces lasted from 1983 to 1990.

Throughout 1989 and 1990 the oppression and armed resistance continued, gradually leading to the reduced effective territorial control of the Barre regime and the withdrawal of American and international support.  By the end of 1990, the Barre regime was in the final stages of complete state collapse.  In early December 1990, President Barre declared a state of emergency and, in January 1991, armed opposition factions finally drove Barre out of power,

resulting in the complete collapse of the central government.  When Barre and his supporters were ousted in 1991, Samantar fled to Italy, finally arriving in the United States in 1997.

After the Barre regime's overthrow early in 1991, Somalia descended into turmoil.[4]  It has been without a central government since this time and much of the territory has been subject to serious civil strife.  Beginning in 1993, a two-year United Nations ("UN") humanitarian effort was able to alleviate some of the famine conditions, mainly in southern Somalia, but the UN was forced to withdraw in 1995 because of Somalia's clan-based civil war and anarchic violence.

In October 2004, a two-year peace process led by the government of Kenya concluded.  At this time Abdullahi Yusuf Ahmed was elected as President of the Transitional Federal Government of Somalia ("TFG") and a transitional government, known as the Somalia Transitional Federal Institutions ("TFIs"), was formed.[5]  The Somalia TFIs include a 275-member parliamentary body, known as the Transitional Federal Assembly ("TFA"), a transitional Prime Minister, Ali Mohamed Gedi, and a 90-member cabinet.  The TFG has been deeply divided since just after its creation and until late December 2006 controlled only the town of Baidoa.  In June 2006, a loose coalition of clerics, business leaders, and Islamic court militias, known as the Supreme Council of Islamic Courts ("CIC" or "Courts"), defeated powerful

---

[4] At this time, the northern region of Somalia withdrew from the rest of the country and formed the Republic of Somaliland.  Somaliland is not formally recognized by any nation, including the United States.  This region has, however, enjoyed relative stability compared to the rest of Somalia.

[5] Although the complaint does not discuss the status of post-1995 Somalia in detail, it is appropriate to understand the environment in which this case was brought.  Accordingly, this opinion includes information about Somalia found in the CIA's World Fact Book, https://www.cia.gov/cia/publications/factbook/geos/so.html (last visited July 27, 2007), and the United States Department of State Bureau of African Affairs Web site, http://www.state.gov/p/af/ci/so (last visited July 27, 2007).

Mogadishu warlords and took control of the capital.  The Courts continued to expand, spreading their influence throughout much of southern Somalia and threatening to overthrow the TFG. Ethiopian and TFG forces, with the backing of the United States, concerned over suspected links between some CIC factions and al-Qaida, drove the CIC from power in late December 2006, but remnants of CIC militia remain near the Kenyan border.  The TFG, backed by Ethiopian forces, was also able to move into Mogadishu at this time, but it continues to struggle to exert control over the capital.

The United States is deeply involved in the process of rebuilding Somalia, primarily out of a concern that the chaos in the region has allowed it to become a breeding ground for terrorists, including al-Qaida.  See United States Department of State ("State Department"), Background Note: Somalia, at http://www.state.gov/r/pa/ei/bgn/2863.htm ("After the attack on the United States of September 11, 2001, Somalia gained greater international attention as a possible entrepot for international terrorism--a concern that became the primary element in U.S. policy toward Somalia.") (last visited July 31, 2007).  This support extends to coordination with the Transitional Federal Government.  See id. ("The United States maintains contacts with the Transitional Federal Government and other key stakeholders in Somalia through the U.S. Embassy in Nairobi, Kenya.").  James Swan, Deputy Assistant Secretary for African Affairs at the State Department spoke on April 21, 2007, and stated that "the United States will do all we can to help enhance the TFI's governance capacity, as well as increase support for efforts to build governance capacity at the local and regional level."  See "United States Policy in Somalia," at http://www.state.gov/p/af/rls/rm/83935.htm (last visited July 31, 2007).  Secretary of State Condoleeza Rice reiterated these sentiments when she appointed Ambassador John M. Yates as

Special Envoy for Somalia, stating that "[t]he United States is committed to helping Somalis develop their national institutions and overcome the legacy of violence and disorder of the past." See "Appointment of Special Envoy for Somalia," May 17, 2007, at http://www.state.gov/secretary/rm/2007/may/85116.htm (last visited July 31, 2007).  The United States has also met with the Prime Minister of the Somalia Transitional Federal Government, Ali Mohamed Gedi, as part of the United States's "efforts supporting lasting peace and stability in Somalia."  See "Meetings with Somali Prime Minister Ali Mohamed Gedi," at http://www.state.gov/r/pa/prs/ps/2007/jun/87331.htm (last visited July 31, 2007).

These official statements and meetings by United States government officials underscore this country's support for the Somalia TFG.  Although that support is not unconditional, it appears that the United States's current policy is to embrace the possibility of democracy in Somalia through these institutions.  These statements also highlight, however, the wide-ranging instability that still permeates the region.

## II. THE PARTIES

### A.    Plaintiff Bashe Abdi Yousuf

Plaintiff Bashe Abdi Yousuf ("Yousuf") is a native of Somalia and is currently a naturalized United States citizen.  Yousuf was a young businessman in Hargeisa, Somalia, when he formed a group called UFFO, with the stated goal of improving living conditions in Hargeisa. Yousuf alleges that on or about November 19, 1981, three National Security Service ("NSS") agents entered the warehouse where he was working, forced him into a truck, and took him to a building reserved for the detention and interrogation of members of UFFO.  He was searched, put in a room, and left for two days without food or water.  Then, in early December 1981, two

military policemen and an NSS officer came to his cell, blindfolded, handcuffed, and forced him into the back of a truck.  When the vehicle stopped, Yousuf was forced down on the ground where the interrogators tightly tied his hands and feet together behind his back so that his body was arched backward in a slightly-tilted "U" shape, with his arms and legs in the air.  The interrogators then placed a heavy rock on his back, causing him excruciating pain.[6]  They also tightened the ropes, causing deep cuts in his arms and legs.  The interrogators questioned Yousuf about the members and activities of UFFO and told him they would stop the torture if he confessed to anti-government crimes.  During the three months he was detained, Yousuf was also subjected to eight sessions of waterboarding[7] and twice endured electric shocks to his armpits.

On or about February 28, 1982, Yousuf and the other detained members of UFFO were taken before the National Security Court, a special military court with jurisdiction over civilians accused of national security crimes, including political offenses.  The trial for the twenty-eight men lasted two days.  Although Yousuf pleaded not guilty, he was sentenced to twenty years in prison, and immediately taken to Hargeisa Central Prison where he remained for eight months. He was then transferred to Labaatan Jirow prison and placed in a small, windowless cell approximately six feet by six feet.  He remained in solitary confinement, in near total darkness, for approximately six and a half years.  He was released from prison in May 1989 and fled Somalia.  He arrived in the United States in 1991.

---

[6] Plaintiffs describe this form of torture as the "Mig," because it placed the prisoner's body in a shape that resembled the Somali Air Force's MIG aircraft.

[7] Waterboarding is a form of torture whereby the individual is immobilized and water is poured over the face, simulating drowning.

B.      Plaintiff Aziz Mohamed Deria, in his capacity as personal representative of the estates of

Mohamed Deria Ali and Mustafa Mohamed Deria

       In 1983, plaintiff Aziz Mohamed Deria fled Somalia because of persecution for his

political activities on behalf of the Isaaq clan.  He is now a naturalized United States citizen,

although many of his family members, including his father, Mohamed Deria Ali, and his younger

brother, Mustafa Mohamed Deria, remained in Somalia.

       Plaintiff alleges that in mid-June 1988, a group of approximately twenty members of the

Somali military forcibly entered the family's home and stated that they were going to kill all the

members of the Isaaq clan that day.  They grabbed Mohamed Deria Ali and dragged him out of

the house.  Later that afternoon, the same group of soldiers returned to the family's home and

reported that Mohamed Deria Ali had been killed.  They then abducted Mustafa Mohamed Deria,

who has not been seen again.

C.      Plaintiffs John Doe I and Aziz Mohamed Deria, in his capacity as personal representative

of the estates of James Doe I and James Doe II

       In December 1984, plaintiff John Doe I, a native, citizen, and resident of Somalia,[8] along

with two of his brothers, decedents James Doe I and James Doe II, and a young nephew were

tending the family's camels in the rural areas around Burao, a small city in the north of Somalia.

A large group of Somali soldiers approached and interrogated them about SNM activity in the

area the previous evening.  When they denied having any knowledge of SNM activities, they

were forced into a military truck and taken to the military installation in the village of

_____

       [8] John Doe I, John Doe II, and Jane Doe requested permission to proceed anonymously
because they feared reprisals against themselves or their families as a result of their participation
in this lawsuit.  This motion was granted on January 7, 2005 (docket # 25).

Magaaloyar, where they were tied in the "Mig" position, beaten and kicked.  Eventually the soldiers threw the three brothers into the back of an army truck, while still tied in the "Mig" position, and transported them to the military base in Burao, where they were interrogated.

The next day they were taken to the military court in Burao.  Two of the soldiers who had detained the three brothers testified that they had hidden SNM fighters and probably were themselves members of the SNM.  Although the brothers' attorney, whom they had met for the first time only at the start of the trial, argued that the brothers were innocent, they were convicted and, four days later, the brothers and other prisoners were sentenced to death, with the sentence to be executed immediately.  The prisoners to be executed were then directed out of the courthouse and into army trucks waiting at the courthouse.  As John Doe I and his brothers entered the truck, an officer asked John Doe I whether the three men were brothers. When John Doe I answered yes, he untied John Doe I from his brothers, led him to the front gate  and ordered the guard at the gate to let him escape.  As John Doe I ran down the road away from the courthouse, he was passed by the truck carrying the condemned prisoners, including his two brothers. The truck was heading for the road to the Burao airport, a well-known execution site. As he reached his brothers' house, he heard the sound of gunshots and saw many people running toward the airport.  James Doe I and James Doe II were among the men executed.

D.      Plaintiff Jane Doe

Plaintiff Jane Doe is a native and citizen of Somalia who currently resides in the United Kingdom.  She alleges that one night in or around July 1985, while she was at home with her family in Hargeisa, several NSS agents broke into her house and took her and the other family members to NSS headquarters, where they were detained for one week.  Jane Doe, who was then

a student, was accused of being a "subversive leader" for her alleged support of the SNM.   A few days later, she was taken to the headquarters of the 26th Military Sector, the headquarters for all military and security forces in the northern region of Somalia, and held in a very small cell with one other woman.  Her arms were tied behind her back with wire and then chained to the wall, and her left leg was chained to the floor.  She was detained at the 26th Military Sector headquarters in this manner for three months.

Jane Doe alleges that she was regularly interrogated and tortured during her detention at the Military Sector headquarters and raped at least fifteen times.[9]  The rapes occurred in a locked, dark room, however, she could see that the rapist was wearing a camouflage uniform. Throughout this period and after, Jane Doe suffered constant and severe physical pain, but she never received medical attention for her injuries.

Months later, Jane Doe was taken from her cell, loaded into an Army truck and taken to the National Security Court.  At her trial, Jane Doe was not permitted defense counsel nor was evidence presented against her.  The following day, the National Security Court sentenced her to life in prison.  She was immediately taken to a truck waiting outside the courthouse and severely beaten by soldiers.  Because of this beating, she could not stand or walk for months.  Jane Doe was taken to Hargeisa Central prison, where she was held alone in a very small cell measuring approximately 3 ½ feet by 5 ½ feet with her hands tied together in front of her at all times.  She remained in solitary confinement for the next three-and-a-half years.

_____

[9] Like other girls in Somalia, Jane Doe had been subject to the practice of infibulation, a procedure whereby her vagina had been sewn closed except for a very tiny hole through which urine and menstrual blood could flow.  She alleges that her rapist opened her vagina by cutting through her skin with the part of a fingernail clipper used for cleaning under the fingernails.

In November 1989, Jane Doe and three other women prisoners were taken to Mogadishu in an Army airplane.  On the sixth night after their arrival, they were taken by Army soldiers to the presidential villa to see Major General Siad Barre, who asked Jane Doe why she supported the SNM.  He told her to stay away from SNM and released her from prison, but ordered her not to leave the country.  After her release, Jane Doe fled Somalia and later emigrated to the United Kingdom.

E.      Plaintiff John Doe II

Plaintiff John Doe II is a native, citizen, and current resident of Somalia.  During the Spring of 1988, John Doe II, a non-commissioned Isaaq officer in the Somali National Army, was assigned to the Hargeisa Department of Public Works to help with the repair of the Hargeisa airport.  In or around June 1988, he was arrested by an Army officer and immediately taken to the headquarters of the 26th Military Sector.  The next afternoon, Army soldiers began taking prisoners and executing them at Malko Dur-Duro, a well-known execution site.  Later that evening, Army soldiers took John Doe II and three other Isaaq officers from their cells and drove them to Malko Dur-Duro.  An Army officer ordered Red Beret soldiers to shoot the prisoners. The Red Berets shot at the men and they all fell backward into the riverbed. John Doe II received only flesh wounds and briefly fell unconscious.  When he awoke, he found himself lying among the dead bodies. He remained there, covered by dead bodies, until the mass execution was completed and the soldiers had left the area.  He subsequently fled Hargeisa and did not return until 1991.

F.      Defendant Samantar

Samantar is a native and citizen of Somalia who currently resides in Fairfax, Virginia, in

the Eastern District of Virginia.  From about January 1980 to December 1986 he served as First

Vice President and Minister of Defense of the Democratic Republic of Somalia.  On or about

January 1987, he was appointed Prime Minister of Somalia, a position he held until

approximately September 1990.  The plaintiffs allege that at all relevant times between 1980 and

1987, Samantar, as Minister of Defense, possessed and exercised command and effective control

over the Somali military.  They allege that he knew, or should have known, that his subordinates

had committed, were committing, or were about to commit extrajudicial killings, attempted

extrajudicial killings, torture, crimes against humanity, war crimes, cruel, inhuman, or degrading

treatment, or arbitrary detentions.  Plaintiff further alleges that, as Prime Minister from 1987 to

1990, Samantar possessed and exercised command and effective control over the Somalia

military and that he was in Hargeisa in May and June of 1988 and had command of the military

forces that were engaged in the indiscriminate attacks upon the civilian population.  Lastly, they

allege that he knew, or should have known, of the pattern and practice of gross human rights

abuses perpetrated against the civilian population by subordinates under his command.

### III. PROCEDURAL BACKGROUND

The complaint in this civil action was originally filed on November 10, 2004.  The

defendant was properly served and responded by filing a motion to dismiss.  The motion was

fully briefed and a hearing was held on January 7, 2005.  As a result of issues raised in the

motion to dismiss and during the hearing, the Court stayed the proceedings to determine whether

the State Department planned to provide a Statement of Interest regarding Samantar's assertion

that he was entitled to sovereign immunity.  The Court ordered Samantar to provide monthly

updates regarding the State Department's position.[10]  Each of Samantar's monthly reports to the

Court reported that the State Department had the matter "still under consideration."

After waiting two years for the State Department to provide some response to Samantar's

request for a Statement of Interest, the Court reinstated the case to the active docket.  Order,

January 22, 2007.  During a status conference held on February 23, 2007, the plaintiffs stated

their intention to file a second amended complaint that added a new cause of action, the joint

criminal enterprise theory of liability, dismissed John Doe III and John Doe IV as plaintiffs, and

inserted plaintiff Aziz Mohamed Deria, in his capacity as personal representative.  Plaintiffs'

Motion for Leave to File the Second Amended Complaint was granted on March 9, 2007.

Shortly thereafter, Samantar filed the instant Motion to Dismiss Second Amended Complaint, in

which he argues, inter alia, that the Court lacks subject matter jurisdiction over the complaint

because he is immune from suit under the Foreign Sovereign Immunities Act of 1976 ("FSIA"),

28 U.S.C. §§ 1602 - 1611.[11]

The plaintiffs filed an opposition, to which Samantar replied.  The parties appeared

before the Court on April 27, 2007, for a hearing on the motion.  The Court granted the

defendant's motion in an oral ruling from the bench and stated that the reasons for dismissal

---

[10] Shortly thereafter, the plaintiffs filed their first amended complaint, which mirrored the original complaint but included the use of pseudonyms for certain plaintiffs.  Samantar then renewed his motion to dismiss and the matter was again fully briefed.  No hearing was held, however, because the Court was awaiting the position of the State Department.

[11] Samantar also argues that "joint criminal enterprise" is not a valid theory of liability, that he was entitled to common law head-of-state immunity, that the action is barred by the applicable ten-year statute of limitations, and that the plaintiffs failed to exhaust their available remedies in Somalia as required by the TVPA.  Because the Court finds that application of the FSIA is dispositive, the other issues will not be reached.

would be more fully explained in a written opinion.

## IV. DISCUSSION

A motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) is reviewed under the same standards as a motion to dismiss for failure to state a claim under Rule 12(b)(6). Lerner v. Fleet Bank, N.A., 318 F.3d 113, 128 (2d Cir. 2003).  On a motion to dismiss, a court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in a plaintiff's favor.  Edwards v. City of Goldsboro, 178 F.3d 231, 244 (4th Cir. 1999).

When a defendant challenges subject matter jurisdiction via a Rule 12(b)(1) motion to dismiss, the pleadings may be regarded as mere evidence on the issue and evidence outside the pleadings may be considered without converting the motion to dismiss into a motion for summary judgment.  See Velasco v. Government of Indonesia, 370 F.3d 392, 398 (4th Cir. 2004).  Moreover, "[w]here the motion to dismiss is based on a claim of foreign sovereign immunity, which provides protection from suit and not merely a defense to liability, . . . the court must engage in sufficient pretrial factual and legal determinations to satisfy itself of its authority to hear the case before trial."  Id. (quoting Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan, 115 F.3d 1020, 1027-28 (D.C. Cir.1997)).

## A.      The Foreign Sovereign Immunities Act

Samantar claims that, as Somalia's former Minister of Defense and Prime Minister, he is entitled to immunity from suit under the FSIA.  "The FSIA provides the sole source of subject matter jurisdiction in suits against a foreign state," subject to certain exceptions.  Velasco, 370 F.3d at 397 (citing Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 434-39

(1989)).  Section 1330(a) of Title 28, United States Code, provides that

> [t]he district courts shall have original jurisdiction without regard to amount in
> controversy of any nonjury civil action against a foreign state as to any . . . claim
> for relief in personam with respect to which the foreign state is not entitled to
> immunity under sections 1605-1607 of this title or under any applicable international agreement.

Section 1604 of Title 28 provides that "[s]ubject to existing international agreements to which

the United States [was] a party at the time of enactment of [the] Act[,] a foreign state shall be

immune from the jurisdiction of the courts of the United States and of the States except as

provided in sections 1605 to 1607 of this chapter."  Neither party argues that an exception is

applicable.[12]  Accordingly, if Samantar's actions are shielded by the FSIA, the Court lacks

subject matter jurisdiction and must dismiss the claims against him.

"Although the statute is silent on the subject, courts have construed foreign sovereign

immunity to extend to an individual acting in his official capacity on behalf of a foreign state."

Velasco, 370 F.3d at 398.  Stated another way, "[c]laims against the individual in his official

capacity are the practical equivalent of claims against the foreign state."  Velasco, 370 F.3d at

398 (citing Chuidian v. Philippine Nat'l Bank, 912 F.2d 1095, 1101 (9th Cir. 1990) (interpreting

§ 1603(b) to include individuals sued in their official capacity)).  Immunity is not provided under

the FSIA, however, to "an official who acts beyond the scope of his authority."  Velasco, 370 at

---

[12] Section 1605 provides certain general exceptions to the applicability of the FSIA,
including: waiver under § 1605(a)(1); disputes arising from commercial activities of a foreign
state under § 1605(a)(2); disputes arising from certain tortious acts committed within the United
States under § 1605(a)(5); and certain actions by state sponsors of terrorism under § 1605(a)(7).
   It should also be noted that the plaintiffs do not argue in the alternative that Somalia does
not qualify as a "state" for purposes of the FSIA.  See e.g., Ungar v. Palestine Liberation
Organization, 402 F.3d 274, 288 (1st Cir. 2005) (holding that Palestine is not a state because it
does not meet the accepted definition of a state as an "entity that has a defined territory and a
permanent population under the control of its own government, and that engages in, or has the
capacity to engage in, formal relations with other such entities.").

398 (citing Chuidian, 912 F.2d at 1106).

B.      Application of the Foreign Sovereign Immunities Act

        The plaintiffs argue that the FSIA does not apply because Samantar acted outside the

scope of his authority.  Specifically, they maintain that the determinative issue is whether the

allegation that Samantar acted contrary to international norms is conclusive as to whether he

acted beyond the scope of his authority and is therefore not covered by the FSIA.  Because this

issue has not been decided by the Fourth Circuit, the Court has looked to its sister courts to

determine the issue.

        Two recent district court cases involving facts that closely parallel the facts of the instant

action, one cited by the defendant and one decided after briefing was completed, lead the Court

to conclude that it lacks subject matter jurisdiction.  See Belhas v. Ya'Alon, 466 F. Supp. 2d 127

(D.D.C. 2006); Matar v. Dichter, 2007 WL 1276960 (S.D.N.Y. May 2, 2007).  In Belhas, citizens

of Lebanon sued former Israeli general Moshe Ya'Alon pursuant to the ATCA and the TVPA,

alleging that the bombing of Qana, within southern Lebanon, by the Israeli military in April 1996

constituted war crimes; extrajudicial killing; crimes against humanity; and cruel, inhuman, or

degrading treatment or punishment.[13]  The defendant was a retired Israeli general who was the

head of the Israeli Army Intelligence at the time of the Qana bombing.  He moved to dismiss on

the grounds that the suit was barred by the FSIA, presented non-justiciable political questions,

and was barred by the act of state doctrine.  The defendant in Belhas presented a letter from the

State of Israel, which described the lawsuit as challenging "sovereign actions of the State of

Israel, approved by the government of Israel in defense of its citizens against terrorist attacks[,]

_____

        [13] The bombing was the result of the conflict between Israel and Hezbollah.

16

and opines that [t]o allow a suit against these former officials is to allow a suit against Israel itself." 466 F. Supp. 2d at 129 (internal quotations omitted).  After analyzing the FSIA, the district court characterized the central issue as: "If General Ya'alon's actions were taken in an official capacity, he therefore was acting as an agency or instrumentality of the foreign state, and is immune from suit under the FSIA."  Id. at 130.  Citing plaintiffs' allegations that the defendant "had command responsibility for the attack," "participated in the decision," and was "acting under color of Israeli law," id. at 130-31, and the lack of allegations that the defendant was acting in his personal capacity or that his activities were private in nature, the court concluded that it "is undisputed that General Ya'alon was acting in his official capacity with respect to the events underlying this lawsuit," and was therefore entitled to immunity under the FSIA.  Id. at 131.

Similar to the plaintiffs in the case before the Court, the plaintiffs in Belhas argued that the TVPA "provides liability for extrajudicial killing even if Defendant's conduct was authorized" by the Israeli government because the FSIA "does not apply to those acting outside the scope of their authority under the applicable domestic or international law, and does not preclude claims against officials for war crimes, crimes against humanity, extrajudicial killing, and cruel, inhuman, or degrading treatment or punishment."  Id.  The Belhas court rejected the first line of reasoning by concluding that "there is no basis in this case to treat individual officials differently from foreign states themselves under the FSIA."  Id. (citing Jacobsen v. Oliver, 451 F. Supp. 2d 181, 195 (D.D.C. 2006) ("Because Section 1603(a) defines 'foreign state' as including 'agencies and instrumentalities,' the distinction between the two is only relevant in the FSIA where explicitly drawn[,] such as in Section 1606 and in Section 1608.")).  The court further reasoned that this conclusion was not an implicit bar to suit against a foreign official acting on

behalf of a foreign state, because "[i]n a case where an FSIA exception applies . . . a foreign official could be sued under the TVPA." Id.

As to the plaintiffs' second argument, that the defendant's actions could not be considered within the scope of his authority because they violated norms of international law and were war crimes, crimes against humanity and constituted prohibited extrajudicial killing, the court held that because the FSIA is the sole basis for obtaining jurisdiction over a foreign state in United States courts, "[t]here is no authority for the proposition that the TVPA, the [ATCA] or any other statute trumps or preempts the FSIA." Id. at 132.  The court further declined to differentiate between individual defendants and foreign states on the basis that "the D.C. Circuit has squarely held that foreign officials acting in their official capacities on behalf of foreign states are agencies and instrumentalities of foreign states, and thus are within the definition of a foreign state under the FSIA." Id. at 133 (citing Jungquist, 115 F.3d at 1027).

Similarly, in Matar, a case not briefed by either party because it was decided a week after the hearing, plaintiffs sued a former director of the Israeli General Security Service under the ATCA and the TVPA, alleging, inter alia, that he was responsible for war crimes; crimes against humanity; cruel, inhuman or degrading treatment or punishment; extrajudicial killings; and other crimes, in that he authorized, planned and directed military personnel in the bombing of a residential neighborhood in Gaza City and developed, implemented, and escalated Israel's targeted killing policy.  2007 WL 1276960, at *1 (internal quotations omitted).  Shortly after the suit was filed, the then-Israeli ambassador to the United States conveyed to the State Department Israel's concerns regarding the "fundamental inappropriateness" of the action.  Id.  Specifically, the letter stated that "anything Mr. Dichter . . . did in connection with the events at issue in the

suit [ ] was in the course of [his] official duties, and in furtherance of official policies of the State of Israel." Id. at *2. The defendant moved to dismiss the case on the grounds that he was immunized from suit under the FSIA. At that point the court invited the State Department to submit its views. In response, the State Department submitted its own Statement of Interest, which warned that "any refusal by U.S. courts to grant immunity to foreign officials for their official acts could seriously harm U.S. interests." Id.

In analyzing whether the FSIA was applicable, the court first determined that "individuals acting pursuant to their official capacity are eligible for immunity under the FSIA." Id. at *6. The court then came to the central question posed to this Court and the Belhas court: whether the FSIA applied to this particular defendant's actions. First, the court concluded that "[p]laintiffs unquestionably sue Dichter in his official capacity [because] [n]othing in the Complaint permits an inference that Dichter's alleged conduct was 'personal and private in nature.'" Id. (citing Leutwyler v. Al-Abdullah, 184 F. Supp. 2d 277, 287 (S.D.N.Y. 2001); Belhas, 466 F. Supp. 2d at 130-131). As further evidence that the defendant acted within the scope of his official duties, the court cited the State of Israel's letter, which was assigned "great weight." Matar, 2007 WL 1276960, at *6 ("Courts assign 'great weight' to the opinion of a sovereign state regarding whether one of its officials was acting within his official scope.") (citing In re Terrorist Attacks of Sept. 11, 2001, 392 F. Supp. 2d 539, 551 (S.D.N.Y. 2005); Rein v. Rein, 1996 WL 273993, at *2 (S.D.N.Y. May 23, 1996)).

Plaintiffs countered, however, as did the plaintiffs in Belhas and in this civil action, that the FSIA does not apply to the types of allegations in the complaint because those acts are necessarily beyond the scope of an official's lawful authority. The court rejected that argument,

finding that "[n]one of the cases cited by the Plaintiffs involved a situation where, as here, the foreign government had expressly ratified the defendant's actions and affirmed that the defendant was acting pursuant to his official duties."  Id. (distinguishing Hilao v. Estate of Marcos, 25 F.3d 1467, 1470-72 (9th Cir.1994) (holding that defendant's acts were "taken without official mandate" where the Philippine government conceded that "Marcos may be held liable for acts done as President"); Doe v. Qi, 349 F. Supp. 2d 1258, 1287 (N.D. Cal. 2004) (no immunity where China "appears to have covertly authorized but publicly disclaimed the alleged human rights violations . . . by Defendants Liu and Xia and asserts that such violations are in fact prohibited by Chinese law"); Cabiri v. Assasie-Gyimah, 921 F. Supp. 1189, 1197 (S.D.N.Y. 1996) (defendant "[did] not claim that the acts of torture he is alleged to have committed fall within the scope of his authority"); Xuncax v. Gramajo, 886 F. Supp. 162, 176 n. 10 (D. Mass. 1995) ("There is no suggestion that either the past or present governments of Guatemala characterize the actions alleged here as 'officially' authorized.")).  Finally, the plaintiffs argued that immunizing officials under the FSIA would conflict with the language of the TVPA.  The court dismissed this argument, citing Belhas for the proposition that a foreign state official acting in his official capacity could be sued under the TVPA "where an FSIA exception applies."  Id. at *8.

Due to the timing of the Matar opinion, the plaintiffs obviously were not able to respond to it.  However, they did argue that Belhas, a nearly identical case,  "is against the weight of authority[,] does not even reference the relevant legislative history of the TVPA," and therefore should be given little weight by this Court.  The factual similarities between the instant action and Belhas and Matar, however, cannot be ignored.  Like the defendants in Belhas and Matar,

Samantar is a retired military leader.  Samantar is perhaps entitled to even more deference

because he was Minister of Defense, a cabinet level position, and then Prime Minister, during the

alleged events. There is also no doubt that Samantar is being sued in his capacity as a former

Minister of Defense and Prime Minister.  The complaint repeatedly states that "Defendant

Samantar, as Minister of Defense," or that "Defendant, as Prime Minister," had the power to take

certain actions.  Compl. ¶¶ 66-68, 71-73, 77.  As in the Belhas and Matar complaints, the

complaint at issue does not allege that Samantar was acting on behalf of a personal motive or for

private reasons.

Moreover, the Somali Transitional Federal Government, which is supported and

recognized by the United States as the governing body in Somalia, has sent two letters to the

State Department regarding this case.[14]  The first letter, dated February 17, 2007, is from the

TFG's Deputy Prime Minister and Acting Prime Minister, Salim Alio Ibro.  This letter provides,

inter alia,

> In the previous letter, our Government also expressed its concern over the
> prosecution in a U.S. court of a lawsuit against a former Prime Minister and head
> of Government Mohamed Ali Samantar.  We requested that your Department
> initiate a statement of interest to request that the court dismiss this lawsuit as a

---

[14] On June 27, 2007, the plaintiffs supplemented their pleadings on this matter with two letters from representatives from the Republic of Somaliland, intended to counter the letters submitted by the defendant.  These letters, dated March 3, 2005, and June 2, 2007, were sent to Secretary Rice at the State Department and reinforce Somaliland's support for the plaintiffs' claims and suggest that the "opportunity for accountability in the United States will help support efforts of democratic transition and promote reconciliation in the region, rather than hinder those efforts."  See Pl.'s Supp. Filing Ex. 2.  To the extent that these letters are intended to provide a counterpoint to the Somalia TFG letters, they fall short.  Plaintiffs have not established that Somaliland is an independent nation, nor that it is a foreign state recognized by the United States.  Accordingly, these letters are not entitled to the same level of deference as are the letters produced on behalf of the Somalia TFG.

violation of Mr. Samantar's immunity and as a threat to the reconciliation efforts then underway in Somalia.

We recently learned that the court is placing the lawsuit (Yousuf v. Samantar, No. 1:04 CV 1360, US Dist. Ct. for the E. Dist. of Va.) back on its active docket. This event makes an expression of such interest that much more important.

We wish to indicate that the actions attributed to Mr. Samantar in the lawsuit in connection with the quelling of the insurgencies from 1981 to 1989 would have been taken by Mr. Samantar in his official capacities and to reaffirm Mr. Samantar's entitlement to sovereign immunity from prosecution for those actions.

We also wish to reemphasize the potential danger to the reconciliation process in Somalia of a lawsuit that would hold a flame to past events and revive old hostilities.

Mot. to Dismiss, Ex. 2. A second letter was presented to the Court on April 27, 2007. This letter, written by Prime Minister Ali Mohammed Gedi, reiterated the Somali TFG's position that Samantar was acting within the scope of his authority during the events at issue. Specifically, the letter, dated April 26, 2007, was intended to "reaffirm Mr. Samantar's entitlement to sovereign immunity" for the actions alleged in the complaint, as they "would have been taken by Mr. Samantar in his official capacities." These letters are entitled to "great weight" and persuade the Court that dismissal is appropriate. See Matar, 2007 1276960, at *6.

C.      Legislative History of the TVPA

As did the plaintiffs in Matar, the plaintiffs in the instant civil action cite the legislative history of the TVPA in arguing that the TVPA clearly forecloses dismissal on sovereign immunity grounds. The legislative history of the TVPA, however, does not necessarily direct the Court to this conclusion. That history provides that the purpose of the TVPA "is to provide a Federal cause of action against any individual who, under actual or apparent authority or under color of law of any foreign nation, subjects any individual to torture or extrajudicial killing." S.

REP. NO. 102-249, at *3 (1991).  The TVPA was also intended to "enhance the remedy already

available" under the ATCA by extending a civil remedy to U.S. citizens who may have been

tortured abroad.  Id. at *5.  However, as the Senate Report makes clear, "the legislation uses the

term 'individual' to make crystal clear that foreign states or their entities cannot be sued under

this bill under any circumstances . . . the TVPA is not meant to override the Foreign Sovereign

Immunities Act of 1976."  Id. at *7; see also H.R. REP. NO. 102-367, at 88 (1991) ("The TVPA is

subject to restrictions in the Foreign Sovereign Immunities Act of 1976.").  Nor is the TVPA

intended to "override traditional diplomatic immunities which prevent the exercise of jurisdiction

by U.S. courts over foreign diplomats."  Id.; see also H.R. REP. NO. 102-367, at 88 ("While

sovereign immunity would not generally be an available defense, nothing in the TVPA overrides

the doctrines of diplomatic and head of state immunity.").

Furthermore, although the legislative history states that the FSIA and traditional

diplomatic immunities are not intended "to provide former officials with a defense to a lawsuit,"

it also clarifies how former officials can successfully invoke the FSIA and avoid liability under

the TVPA.  Specifically, it states that,

> To avoid liability by invoking the FSIA, a former official would have to prove an
> agency relationship to a state, which would require that the state "admit some
> knowledge or authorization of relevant acts." 28 U.S.C. 1603(b).  Because all
> states are officially opposed to torture and extrajudicial killing, however, the FSIA
> should normally provide no defense to an action taken under the TVPA against a
> former official.

S. REP. NO. 102-249, at *8 (emphasis added).  According to this legislative history, in those cases

where a state "admit[s] some knowledge or authorization of relevant acts," the FSIA applies and

that former official should be entitled to immunity.  Such is the case before the Court.  The

Somali TFG, which is the only Somali government supported and recognized by the United

States, has unequivocally stated that "the actions attributed to Mr. Samantar in the lawsuit in connection with the quelling of the insurgencies from 1981 to 1989 would have been taken by Mr. Samantar in his official capacities."  Accordingly, the government of Somalia has ratified the actions of Samantar, thereby shielding his actions under the cloak of immunity provided by the FSIA.  This result is in accord with the legislative history of the TVPA and President George H. W. Bush's signing statement that accompanies the TVPA:

> I note that H.R. 2092 does not help to implement the Torture Convention and does present a number of potential problems about which the Administration has expressed concern in the past.  This legislation concerns acts of torture and extrajudicial killing committed overseas by foreign individuals. With rare exceptions, the victims of these acts will be foreign citizens. There is thus a danger that U.S. courts may become embroiled in difficult and sensitive disputes in other countries, and possibly ill-founded or politically motivated suits, which have nothing to do with the United States and which offer little prospect of successful recovery.  Such potential abuse of this statute undoubtedly would give rise to serious frictions in international relations and would also be a waste of our own limited and already overburdened judicial resources. . . . The expansion of litigation by aliens against aliens is a matter that must be approached with prudence and restraint.  It is hoped that U.S. courts will be able to avoid these dangers by sound construction of the statute and the wise application of relevant legal procedures and principles.

1992 U.S.C.C.A.N. 91.

## D.     Cases Holding that Official Acted Outside the Scope of his Lawful Authority

The plaintiffs rely on case law from the Ninth Circuit to contend that some courts have found a defendant's actions to be outside the scope of his authority and therefore amenable to suit under the TVPA and the ATCA, and argue that this Court should take the same approach. Both cases concerned actions brought against the former Philippine President Ferdinand Marcos and his daughter, Imee Marcos-Manotoc, and alleged that during Ferdinand Marcos' tenure as president of the Philippines, up to 10,000 people were tortured, summarily executed, or

24

disappeared at the hands of the military intelligence personnel, which operated under the authority of Marcos and his daughter Imee Marcos-Manotoc.  After the two fled to Hawaii, numerous lawsuits were filed by plaintiffs claiming that they had been arrested and tortured, or were related to people arrested, tortured, and executed.  See Trajano v. Marcos (In re Estate of Ferdinand Marcos, Human Rights Litigation), 978 F.2d 493 (9th Cir. 1992); Hilao v. Marcos (In re Estate of Ferdinand Marcos, Human Rights Litigation), 25 F.3d 1467 (9th Cir. 1994).

Both Trajano and Hilao are easily distinguishable from the case before the Court.  In Trajano, the defendant, by defaulting, was deemed to have admitted the allegations in the complaint and to have conceded that she acted outside the scope of her authority.  In Hilao, the Philippine government affirmed that Marcos' actions were taken outside the scope of his authority, and stated that foreign relations would "not be adversely affected" if the case were to continue.[15]  That affirmation contrasts directly with the statement provided by the Somali TFG in this case, which clearly states that foreign relations would be adversely affected by this litigation, and that if the litigation progressed, it could inflame already high tensions in the region.

---

[15] The Minister of Justice of the Philippine government had written a letter asserting that Marcos could be held liable for the acts done as President and that "the government or its officials may not validly claim state immunity for acts committed against a private party in violation of existing law."  Hilao, 25 F.3d at 1471.  The Philippine government also filed an amicus curiae brief in related litigation stating that "foreign relations with the United States will not be adversely affected if these human rights claims against Ferdinand Marcos are heard in U.S. courts."  Id. (emphasis in original).
    Although the Ninth Circuit did not discuss it, presumably such a letter would also act as an express waiver of sovereign immunity under § 1605(a)(1), which would also subject Marcos to the jurisdiction of the federal court.

E.      Jus Cogens[16]

Although the plaintiffs do not attempt to argue that violations of jus cogens norms

constitutes an implied waiver of sovereign immunity under § 1605(a)(1), several circuit courts

addressing similar issues have held that they do not.  See Sampson v. Federal Republic of

Germany, 250 F.3d 1145, 1156 (7th Cir. 2001) ("We conclude that Congress did not create an

implied waiver exception to foreign sovereign immunity under the FSIA for jus cogens

violations."); Smith v. Socialist People's Libyan Arab Jamahiriya, 101 F.3d 239, 245 (2d Cir.

1996) ("Our rejection of the claim that a jus cogens violation constitutes an implied waiver

within the meaning of the FSIA . . . rests on our understanding that Congress did not intend the

implied waiver exception of section 1605(a)(1) to extend so far, however desirable such a result

might be."); Siderman de Blake v. Republic of Argentina, 965 F.2d 699, 714 (9th Cir. 1992)

("While we agree with the Sidermans that official acts of torture of the sort they allege Argentina

to have committed constitute a jus cogens violation, we conclude that Amerada Hess forecloses

their attempt to posit a basis for jurisdiction not expressly countenanced by the FSIA.").

## V. CONCLUSION

The allegations in the complaint clearly describe Samantar, at all relevant times, as acting

upon the directives of the then-Somali government in an official capacity, and not for personal

reasons or motivation.  To allow such a suit to proceed would, in the words of the Chuidian

---

[16] The Vienna Convention on the Law of Treaties defines a jus cogens norm, also known as a "peremptory norm" of international law, as a "'a norm accepted and recognized by the international community of states as a whole as a norm from which no derogation is permitted and which can be modified only by a subsequent norm of general international law having the same character.'" Siderman de Blake v. Republic of Argentina, 965 F.2d 699, 714 (9th Cir. 1992) (quoting Vienna Convention on the Law of Treaties, art. 53, May 23, 1969, 1155 U.N.T.S. 332, 8 I.L.M. 679).

court, "amount to a blanket abrogation of foreign sovereign immunity by allowing litigants to accomplish indirectly what the Act barred them from doing directly."  912 F.2d at 1102.  "The rule that foreign states can be sued only pursuant to the specific provisions of sections 1605-07 would be vitiated if litigants could avoid immunity simply by recasting the form of their pleadings [by naming an individual official of the government instead of the foreign state itself]." Id.

Unlike every case cited by the plaintiffs, the Somalia TFG has not disavowed the actions of the defendant.  Nor has it implied that the suit could go forward without affecting international relations and the current situation in Somalia.  Rather, it has explicitly stated that the actions of the defendant were taken in his official capacity.  Furthermore, the recent opinions in Belhas and Matar so closely parallel the instant action that their reasoning is informative and persuade the Court that dismissal of the civil action is the appropriate resolution.

In finding that Samantar is immune from liability in these proceedings under the FSIA, the Court does not intend to minimize the gravity of the plaintiffs' allegations.  Violations of human rights by governments and their agents should not be tolerated by civilized societies. However, a court must proceed cautiously in this area to avoid interfering with delicate international relations.  As the D.C. Circuit recognized in Princz v. Federal Republic of Germany, 26 F.3d 1166 (D.C. Cir. 1994), in the context of evaluating why violations of jus cogens norms did not constitute an implied waiver of sovereign immunity under § 1605(a)(1):

> We think that something more nearly express is wanted before we impute to the Congress an intention that the federal courts assume jurisdiction over the countless human rights cases that might well be brought by the victims of all the ruthless military juntas, presidents-for-life, and murderous dictators of the world, from Idi Amin to Mao Zedong.  Such an expansive reading of § 1605(a)(1) would likely place an enormous strain not only upon our courts but, more to the

immediate point, upon our country's diplomatic relations with any number of foreign nations. In many if not most cases the outlaw regime would no longer even be in power and our Government could have normal relations with the government of the day—unless disrupted by our courts, that is.

Id. at 1175 n. 1.

For the above stated reasons, Samantar is entitled to sovereign immunity under the FSIA for the acts he undertook on behalf of the Somali government. Accordingly, the Court does not have subject matter jurisdiction over the plaintiffs' claims, brought under the TVPA and the ATCA, and Defendant Samantar's Motion to Dismiss Second Amended Complaint has been granted. An appropriate order will issue with this Memorandum Opinion.

Entered this 1st day of August, 2007.

_____/s/_____
Leonie M. Brinkema
United States District Judge

Alexandria, Virginia