IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

AUG 28 2012

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

BASHE ABDI YOUSUF, et al.,    )
                             )
        Plaintiffs            )
                             )
    v.                        )      1:04cv1360(LMB/JFA)
                             )
MOHAMED ALI SAMANTAR,         )
                             )
        Defendant.            )

### MEMORANDUM OPINION

This matter came before the Court on a bench trial for damages following defendant's decision to accept a default judgment as to liability and not contest damages.

### I.    BACKGROUND

#### A. Procedural Background

The plaintiffs in this litigation, all natives of Somalia, are Bashe Abdi Yousuf ("Yousuf"), Buralle Salah Mohamoud ("Buralle"), Ahmed Jama Gulaid ("Gulaid"), and Aziz Mohamed Deria ("Aziz"). Aziz proceeds solely in his capacity as personal representative of the estates of his father Mohamed Deria Ali ("Mohamed"), his brother Mustafa Mohamed Deria ("Mustafa"), and the brothers of plaintiff Buralle, Abdullahi Salah Mahamoud ("Abdullahi") and Cawil Salah Mahamoud ("Cawil"). See Second Am.

Compl. ¶¶ 8-10, 12; Dkt. No. 304.[1]

The second amended complaint raises claims under the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350, which gives the district courts "original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States."[2] The second amended complaint also alleges violations of the Alien Torture Victim Protection Act ("TVPA"), Pub. L. No. 102-256, 106 Stat. 73 (1992)(codified at 28 U.S.C. § 1350 note), which provides:

> An individual who, under actual or apparent authority, or color of law, of any foreign nation--
> > (1) subjects an individual to torture shall, in a civil action, be liable for damages to that individual; or
> > (2) subjects an individual to extrajudicial killing shall, in a civil action, be liable for damages to the individual's legal representative, or to any person who may be a claimant in an action for wrongful death.

§ 1350 note sec. 2(a).[3]

---

[1] Aziz was originally named as an individual plaintiff. Then, in 2007, the Virginia Circuit Court for the City of Alexandria appointed Aziz administrator of the estates of the four decedents, Mohamed, Mustafa, Abdullahi, and Cawil. See Dkt. No. 77 at 2. In the second amended complaint, the caption was changed to reflect Aziz's status as personal representative of these four estates, rather than as a plaintiff pursuing claims in his individual capacity. Id.; see also Dkt. No. 81 at 2 n.2.

[2] Codified as part of the Judiciary Act of 1789, the ATS is also commonly called the Alien Tort Claims Act ("ATCA").

[3] Unlike the ATS, the TVPA is not itself a jurisdictional statute; rather, 28 U.S.C. § 1331 provides its jurisdictional basis. Yousuf v. Samantar, 552 F.3d 371, 375 (4th Cir. 2009).

Plaintiffs allege that defendant is liable for extrajudicial killing; attempted extrajudicial killing; torture; cruel, inhuman, and degrading treatment or punishment; arbitrary detention; crimes against humanity; and war crimes committed during his tenure as First Vice President and Minister of Defense of Somalia's central government from January 1980 to December 1986 and as Prime Minister from January 1987 to September 1990.

On January 1, 2005, plaintiffs were granted permission to proceed anonymously.[4] On August 30, 2005, the action was stayed to allow the United States Department of State ("State Department") to submit its position as to whether defendant was entitled to head of state immunity. After nearly a year and a half, during which time the State Department never responded, the case was returned to the active docket on January 22, 2007. Plaintiffs thereafter filed a second amended complaint, and on April 27, 2007, the defendant's first motion to dismiss was granted on the basis that Samantar was immune from suit under the Foreign Sovereign Immunities Act ("FSIA"). That decision was reversed and remanded. Yousuf v. Samantar, 552 F.3d 371 (4th Cir. 2009), aff'd Samantar v. Yousuf, 130 S. Ct. 2278 (2010).

Following remand, defendant filed a second motion to

---

[4] On February 1, 2012, a consent motion to amend the case caption was granted, after which the plaintiffs who had proceeded under pseudonyms were named.

dismiss in which he argued, among other things, that defendant was entitled to common law immunity even if the FSIA did not bar plaintiffs' claims. The United States then filed a Statement of Interest asserting that defendant was not immune from suit for the acts alleged, a view that was based on an opinion submitted by the State Department's Office of the Legal Adviser. See Dkt. No. 147. Defendant's motion to dismiss was thereafter denied, as were his subsequent motions for reconsideration and for a stay pending appeal. See Dkt. No. 158; Dkt. No. 168.[5]

Defendant thereafter moved for summary judgment on the grounds that the second amended complaint failed to state a claim and failed to allege a basis for secondary liability, that the TVPA did not apply to claims arising before 1991, and that plaintiffs' claims were untimely and nonjusticiable. The Court denied defendant's motion from the bench on December 22, 2011, rejecting defendant's legal arguments that plaintiffs could not prevail under the ATS, the TVPA, or on a theory of secondary liability, and finding that equitable tolling applied to the statutes. A jury trial was then scheduled to start on Tuesday,

---

[5] Defendant later filed a renewed motion for a stay, which was denied on February 14, 2012. He also filed a motion to stay with the Court of Appeals, in which he requested a stay pending that court's ruling on his appeal of the denial of common law immunity; however, that motion was denied on February 17, 2012. On May 16, 2012, the Court of Appeals heard oral argument on defendant's appeal of the denial of common law immunity. See Yousuf v. Samantar, No. 11-1479, Dkt. No. 78 (4th Cir. filed May 6, 2011). No opinion has yet issued.

February 21, 2012.

On Sunday, February 19, 2012, defense counsel filed a Suggestion of Bankruptcy informing the Court that defendant had filed a petition for relief under Chapter 7 of Title 11 of the United States Code. The case was stayed pursuant to the automatic stay provision of 11 U.S.C. § 362. See Hearing Tr. at 3:11-4:14 (Feb. 21, 2012, Dkt. No. 350). Plaintiffs immediately sought relief from the bankruptcy court, which lifted the automatic stay with respect to this litigation; accordingly, this Court vacated its Order imposing the stay. See Dkt. No. 351. The jury trial was rescheduled to begin on Thursday, February 23, 2012. Id.

On the morning of February 23, 2012, defense counsel informed the Court that defendant intended to take a default rather than contest liability and damages. See Colloquy Tr. at 4:6-19 (Feb. 23, 2012, Dkt. No. 355). During a subsequent colloquy with Samantar, the Court explained the consequences of default, which Samantar stated had also been explained to him by counsel. Id. at 6:15-9:24. Based on defense counsel's representations and defendant's answers during the colloquy, the Court found that defendant had knowingly and voluntarily conceded liability. Id. at 10:11-11:4; see Dkt. No. 353 (minute entry). Plaintiffs' request for a jury trial as to damages was denied, and the case proceeded to a bench trial on that issue.

5

See, e.g., Mwani v. Bin Ladin, 244 F.R.D. 20, 23-24 (D.D.C. 2007)(denying request for jury trial after entry of default in ATS case because no right to jury trial on damages exists).

### B. Factual Background

Because defendant has agreed to a default, plaintiffs' uncontested factual allegations in the second amended complaint, as well as uncontroverted and credible testimony produced during the bench trial, are accepted as true. See, e.g., DIRECTV, Inc. v. Rawlins, 523 F.3d 318, 322 n.2 (4th Cir. 2008)(citation omitted); Licea v. Curacao Drydock Co., 584 F. Supp. 2d 1355, 1358 (S.D. Fla. 2008)(citing Nishimatsu Constr. Co. v. Houston Nat'l Bank, 515 F.2d 1200, 1206 (5th Cir. 1975)). Plaintiffs allege that defendant is liable under the ATS and TVPA for the extrajudicial killing of Mohamed, Mustafa, Abdullahi, and Cawil; the attempted extrajudicial killing of Gulaid; the torture of Yousuf, Gulaid, and Buralle; the cruel, inhuman, or degrading treatment of Gulaid and Buralle; and the arbitrary detention of Gulaid and Buralle. See Second Am. Compl. ¶¶ 92-138. In addition, Gulaid, Buralle, and Aziz, in his capacity as personal representative of the estates of the decedents, allege that defendant perpetrated crimes against humanity and war crimes. See id. ¶¶ 139-56.

Based on the allegations in the second amended complaint and the evidence presented at trial, the Court finds that in

October 1969, Major General Mohamed Siad Barre ("Barre")
overthrew Somalia's democratically elected government and
installed a military regime that targeted certain Somali clans,
particularly the Isaaq clan, to which all of the plaintiffs and
decedents belong. Id. ¶¶ 14-16, 19-20. The Barre regime
maintained its control over the population through its security
and intelligence forces, including the Somali Armed Forces, of
which defendant Mohamed Ali Samantar was commander during the
relevant period. Id. ¶¶ 17-18. Samantar, a Somali citizen who
now resides in Fairfax, Virginia, served in the Barre government
as First Vice President and Minister of Defense from January
1980 through December 1986, and as Prime Minister from January
1987 through September 1990. Id. ¶¶ 6-7.

In response to the brutality of the Barre regime, some
members of the Isaaq clan formed a resistance organization
called the Somali National Movement ("SNM"). Id. ¶ 20. The Barre
regime tried to suppress the SNM through a violent military
campaign, which included indiscriminate attacks on areas
populated by Isaaq clan members, and it "intentionally
disregarded the distinction between civilians and SNM fighters."
Id. ¶ 21. The violence between the SNM and the Barre regime
continued from 1983 through 1990.

A State Department report found that the systematic
assaults on unarmed civilians by the Somali Armed Forces

resulted in more than 5,000 deaths and the internal displacement of more than one million Somalis. See Pls.' Ex. 112 at 60-61 (State Department-commissioned report on effect of conflict in Northern Somalia); Pls.' Ex. 20 at 6, 9-11 (Ambassador James Keough Bishop's expert report on human rights in Somalia).[6] Another 400,000 people fled to Ethiopia as refugees. Pls.' Ex. 129 at 351 (State Department Report to United States Senate Committee on Foreign Relations). Hargeisa, Somalia's second largest city and where many plaintiffs lived, experienced particularly heavy fighting. Second Am. Compl. ¶ 23.

In January 1991, armed opposition factions succeeding in ousting Barre from power, and his government collapsed. Id. ¶ 24. Members of that government, including Samantar, fled Somalia. Samantar settled first in Italy and then relocated to the United States in 1997. Id.

## II.   DISCUSSION

### A. Statutes of Limitations and Equitable Tolling

At summary judgment, defendant unsuccessfully argued that plaintiffs' causes of action are barred by the applicable

---

[6] As the Court observed at trial, some of plaintiffs' exhibits also reference battle tactics and human rights violations, smaller in scope, by the SNM. See Pls.' Ex. 112 at 42 (describing SNM fighters' tactic of hiding among civilians in Hargeisa), 64 (same), 62 (giving accounts of SNM combatants killing unarmed civilians).

statutes of limitations.[7] Although Samantar subsequently waived this defense by defaulting and thereby failing to contest the issue at trial, this issue will be addressed below in the interest of creating a complete record. See Xuncax v. Gramajo, 886 F. Supp. 162, 192 (D. Mass. 1995)(defaulting defendant waived statute of limitations defense); cf. Bradford-White Corp. v. Ernst & Whinney, 872 F.2d 1153, 1160-61 (3d Cir. 1989) (holding that defendant waived statute of limitations defense when it raised issue in the answer but failed to further press the defense), cert. denied, 493 U.S. 993 (1989).

Statutes of limitations are designed to assure fairness to a defendant and to relieve courts of the burden of evaluating stale claims brought by a plaintiff who failed to exercise due diligence in asserting his or her rights. See, e.g., Burnett v. N.Y. Cent. R.R. Co., 380 U.S. 424, 428 (1965). The TVPA prescribes a limitations period of ten years from the date the cause of action arose. 28 U.S.C. § 1350 note sec. 2(c). Although the ATS does not include a statute of limitations, the TVPA's ten-year limitations period is widely applied to the ATS. E.g., Chavez v. Carranza, 559 F.3d 486, 491-92 (6th Cir. 2009)("Like all courts that have decided this issue . . . we conclude that the ten-year limitations period applicable to claims under the

---

[7] Summary judgment as to the statutes of limitation was orally denied, and resolution of the issue was continued to the trial for development of the full factual record. See Dkt. No. 290.

TVPA likewise applies to claims made under the ATS."); Doe v.
Islamic Salvation Front, 257 F. Supp. 2d 115, 119 (D.D.C.
2003)(following "federal courts [that] found the TVPA to be
closely analogous to the [ATS] and borrowed its ten-year statute
of limitations for the [ATS]"). In this case, the alleged
violations occurred between 1981 and 1989, yet this civil action
was not filed until 2004, well outside the ten-year window.

   In civil suits between private litigants, however,
limitations periods "are customarily subject to equitable
tolling." Irwin v. Dep't of Veterans Affairs, 498 U.S. 89, 95
(1990)(quoting Hallstrom v. Tillamook Cnty., 493 U.S. 20, 27
(1989))(internal quotation marks omitted). "Equitable tolling is
a discretionary doctrine that turns on the facts and
circumstances of a particular case." Crabill v. Charlotte
Mecklenburg Bd. of Educ., 423 F. App'x 314, 321 (4th Cir.
2011)(internal quotation marks omitted). Application of the
doctrine to permit an otherwise time-barred case to proceed is
appropriate when "extraordinary circumstances beyond [a
plaintiff's] control prevented him from complying with the
statutory time limit." Spencer v. Sutton, 239 F.3d 626, 630 (4th
Cir. 2001)(quoting Harris v. Hutchinson, 209 F.3d 325, 330 (4th
Cir. 2000))(internal quotation marks omitted).

   Courts evaluating the ATS and TVPA have consistently held
that equitable tolling applies to these statutes. See, e.g.,

Arce v. Garcia, 400 F.3d 1340, 1346 (11th Cir. 2005), rev'd on
other grounds (applying "general rule . . . that statutes of
limitations are subject to equitable tolling" because "nothing
in the text, structure, or legislative history of the TVPA . . .
changes this general rule"); Hilao v. Estate of Marcos, 103 F.3d
767, 773 (9th Cir. 1996)(applying equitable tolling to find
plaintiff's suit under the ATS and TVPA timely).

    There are several recognized bases for tolling the
limitations period under the ATS and TVPA. For example, courts
have held that either a defendant's absence from the United
States or a plaintiff's lack of access to a judicial remedy in
his native country due to extreme unrest and legitimate fear of
retaliation can serve as grounds to toll a statute of
limitations. See, e.g., Chavez, 559 F.3d at 493-94 (listing fear
of reprisal and lack of system for administering justice as two
grounds for tolling); Arce v. Garcia, 434 F.3d 1254, 1262-
63 (11th Cir. 2006)(same); Jean v. Dorelien, 431 F.3d 776, 779-
80 (11th Cir. 2005)(tolling statute of limitations until the
defendant arrived in the United States after his government had
lost power).

    As previously discussed, the military government that
defendant served between January 1980 and September 1990 was
violently overthrown in 1991, and Somalia's central government
collapsed. See Second Am. Compl. ¶¶ 5-6, 86. Plaintiffs allege

11

that after this collapse, the country "fell into increasing chaos" as the 1990s progressed, resulting in the killing, displacement, and mass starvation of tens of thousands of Somali citizens. Id. at 86. The United Nations, which had attempted to bring stability through a military intervention in 1992, was driven from the country in 1994. Id. Plaintiffs allege that deliberate killing and kidnapping of Somalis as a result of their clan membership was systematic in the ensuing years. Id.

For these reasons, "[c]onditions in Somalia precluded human rights cases against former commanders of the Somali Armed Forces," such as the defendant, "from being brought either in Somalia or the United States or elsewhere." Id. ¶ 87. To this day, Somalia "remains without a functioning national government and national judicial system" that could hear and adjudicate claims for human rights abuses during the Barre administration. Id. ¶¶ 87-91. Plaintiffs' allegation that it was impossible to file suit while they and their relatives continued to reside inside a destabilized and violent Somalia is unrefuted.

In addition to the turmoil within Somali, defendant's absence—and plaintiffs' lack of knowledge about his whereabouts in the years following his departure from Somalia—prevented the commencement of this lawsuit. It is undisputed that Samantar did not relocate to the United States until 1997. Id. ¶ 84. From 1991 to 1997, he resided within Italy. At summary judgment,

Samantar cited to the TVPA's legislative history, which states that the limitations period "should be tolled during the time the defendant was absent from" the United States or any other similar jurisdiction permitting this kind of cause of action and affording a remedy that "is adequate and available." S. Rep. No. 102-249, 102d Cong. (1991), available at 1991 WL 258662, at *11. Based on this passage, Samantar argued that the statute of limitations should not be tolled during those six years because plaintiffs should have located him and filed their claims in Italy, which would have afforded them an adequate remedy.

Samantar's only evidence that Italian law provided an adequate and available remedy was the affidavit of an Italian corporate law attorney, Cosimo Rucellai, who was deemed by this Court not to be an expert and whose testimony was stricken. Meanwhile, plaintiffs' expert, the director of the Geneva Academy of International Humanitarian Law and Human Rights, stated during her deposition that it would have been impossible for plaintiffs to have obtained relief in Italy because no cause of action similar to the ATS or TVPA existed under Italian law. It would therefore have been uncontested at trial that Italy did

not afford plaintiffs an adequate or available remedy.[8]

The violations alleged took place between 1981 and 1989 and was part of ongoing conduct before the fall of the Barre regime in 1991. For the reasons discussed above, the statutes of limitations on plaintiffs' claims were tolled between 1991 and 1997 when defendant resided in Italy and did not start running on these claims until Samantar's 1997 arrival in the United States. Plaintiffs filed this civil action in 2004, which was within seven years of defendant's arrival in the United States and was, therefore, not time-barred. See Doe v. Saravia, 348 F. Supp. 2d 1112, 1146-48 (E.D. Cal. 2004); cf. United States v. Buchanan, 638 F.3d 448, 457 (4th Cir. 2011)(holding that time remaining on a statute of limitations "clock" is calculated by subtracting the duration of the pause for equitable tolling from the total time on the clock)(citing United States v. Ibarra, 502 U.S. 1, 4 n.2 (1991)).

## B. Factual Findings

### 1. Bashe Abdi Yousuf

Plaintiff Yousuf, now a United States citizen who has

---

[8] Even had an adequate remedy been available in Italy, evidence at summary judgment showed that Samantar did not work, contribute taxes, or pay rent on his apartment, which was provided by the Italian government, while in that country. He also did not know whether his name was listed in the Rome telephone directory. Defendant's own affidavit was the only evidence that he had lived openly in Italy, such that plaintiffs could have found him.

resided in this country since 1991, was born in Hargeisa,
Somalia in 1953. He ran a successful family business in Hargeisa
until 1981, when he was arrested for his participation in a
charitable group called UFFO, which he described as being
dedicated to improving education and healthcare in the city. See
Trial Tr. Vol. 1 at 8:2-10:12 (Feb. 23, 2012, Dkt. No. 357);
Second Am. Compl. ¶¶ 25-27. In particular, UFFO cleaned the
sewage system of the Hargeisa General Hospital and raised money
to procure medical supplies. See Trial Tr. Vol. 1 at 9:15-10:1;
Second Am. Compl. ¶ 26.

On November 19, 1981, while conducting business at his
warehouse, Yousuf was arrested by National Security Services
agents who took him to a government building being used for
interrogations of Isaaq UFFO members. Trial Tr. Vol. 1 at 11:1-
23; Second Am. Compl. ¶ 27. He was thereafter locked in a room
for two days and deprived of food and water. Id. On the third
day, an armed member of the Somali Armed Forces, as well as
several plain-clothed individuals, removed Yousuf from the room
and questioned him about his association with UFFO.

Yousuf was returned to that room and detained for three
weeks before his interrogators returned. They questioned him
about whether he had ever thrown a bomb; upon denying that he
had ever "once even seen a bomb, let alone throwing [sic] it,"
he was returned to his room. See Trial Tr. Vol. 1 at 13:17-

15

14:13. At midnight, the men returned again and forced a blindfolded Yousuf into a Land Cruiser, after which he was driven outside the city through a military checkpoint. Id. at 14:14-15:12. Once outside the city, Yousuf was forced to lie face-down on the ground with his hands and feet tightly bound together in what is known as the "Mig" position. See Trial Tr. Vol. 1 at 15:14-16:7; Second Am. Compl. ¶¶ 28-29. Pressure was placed on his back through a rock or a foot, causing him significant pain. Id. Interrogators then turned Yousuf onto his back and continued the torture by forcing water into his mouth while cutting off air passageways until he lost consciousness. See Trial Tr. Vol. 1 at 15:20-24; Second Am. Compl. ¶ 30. Yousuf sustained injuries that night, including cuts, and was unable to walk for several days. See Trial Tr. Vol. 1 at 16:8-15.

Yousuf was tortured in the same manner "at least four or five times" during his detention. Id. at 17:2. Interrogators also once applied electric shocks through Yousuf's armpits. Id. at 17:3-4.[9] Around February 19, 1982, after approximately three months in detention, Yousuf was charged with high treason. See Second Am. Compl. ¶ 32. He was able to meet for only five to ten

---

[9] There are discrepancies between allegations in the second amended complaint and the testimony as to the number of times that Yousuf was tortured. For example, the complaint alleges that Yousuf was tortured eight times, not four or five as he stated on the stand, and that electric shock was used twice, not once. These are relatively minor discrepancies that do not impeach Yousuf's overall credibility.

minutes with a court-appointed defense attorney who "admitted there was no redress available." Id. On February 28, 1982, Yousuf and over two dozen other members of UFFO were tried over the course of two days in the National Security Court, a "military court with jurisdiction over civilians accused of national security crimes." Id. ¶ 33. Two judges, a military officer and a police captain, presided, and only government witnesses testified; Yousuf and the other defendants were not permitted to speak. Id. ¶ 34; Trial Tr. Vol. 1 at 18:19-19:25. On March 3, 1982, Yousuf and 20 of the other defendants were convicted, and Yousuf was sentenced to twenty years in prison. Trial Tr. Vol. 1 at 21:7-21; Second Am. Compl. ¶ 35. After eight months in the Hargeisa jail, which was infested and had no bathroom, Yousuf "was transferred to Labaatan Jirow prison, a notorious maximum security prison for political prisoners" where he was housed in a small, windowless cell infested with rodents and insects. See Trial Tr. Vol. 1 at 22:5-10, 24:13-25:12, 28:22-29:9; Second Am. Compl. ¶ 36. In that cell, which was entirely dark when the door was closed, he remained primarily in solitary confinement for seven years. See Trial Tr. Vol. 1 at 26:1-4, 27:18-22, 29:18-31:19; Second Am. Compl. ¶ 36. As Yousuf testified, "I did not speak with anybody. . . . I was sometimes wondering if I still remember my, even my native language. . . . The worst torture you can go through is isolation. You turn into

an animal." Trial Tr. Vol. 1 at 26:2-4, 31:7-8.

In 1989, Yousuf was blindfolded and placed in a Land Cruiser with other prisoners. He was released, without explanation, near the city of Biadaba. After traveling first to Saudi Arabia, Yousuf applied for political asylum in the United States and relocated to this country in 1991.

## 2. Buralle Salah Mohamoud

Plaintiff Buralle, who testified through the assistance of an interpreter, was born in 1962 and lives in the Burao region of Somalia in a village that, during the relevant period, was an hour away from the closest town. Plaintiff tended goats and camels, a life-long occupation. In 1984, plaintiff's family was engaged in a religious ceremony when the colonel from a nearby military base and 60-70 members of the Somali Armed Forces arrived at his home and encircled plaintiff's family. See Trial Tr. Vol. 1 at 42:3-43:24; Second Am. Compl. ¶ 43. After shooting into the air and stating that they were looking for SNM members, the soldiers seized plaintiff and his two brothers, decedents Abdullahi and Cawil. See Trial Tr. Vol. 1 at 44:1-43:24.[10]

Plaintiff and his brothers were kept overnight by the military. In the morning, they were driven to another town,

---

[10] Although the estates of Cawil and Abdullahi are represented in this litigation by plaintiff Aziz, the allegations supporting the claims of their estates will be addressed in this section for purposes of clarity.

18

where they were beaten and tied into the Mig position. Id. at 45:9-46:8. Plaintiff and his brothers were loaded into a truck and taken to military headquarters in Burao where they were untied and, unable to move after having been tightly restrained for over an hour, were beaten again. Id. at 48:1-16. Soldiers asked plaintiff and his brothers whether they had hidden SNM members. They denied having any information about SNM but were nevertheless put inside a crowded, filthy, windowless jail with other Isaaq men. Id. at 48:23-51:6.

After four nights, the men were taken to a military court located only 15 minutes from the jail. Eighty prisoners in total were brought to the court, which was surrounded by Somali government soldiers. Id. at 51:8-22. A military lawyer was appointed, although plaintiff asserts that "he didn't do anything for us." Id. at 52:2-5. The men were not permitted to speak on their own behalf. Id. at 52:20-53:3. The only evidence presented against Buralle and his brothers was the large meal the family had been cooking, which military prosecutors had argued proved that they were aiding the SNM; plaintiff, however, testified in this case that the family meal was part of a religious ceremony. Id. at 52:13-19.

Following the proceeding, plaintiff and his brothers were returned to jail, and during the next eight days, their handcuffs were never removed. Id. at 55:1-12. They were then

brought back to court where they were convicted and sentenced to death along with 40 other prisoners. Id. at 56:17-57:11. Because the sentence was to be executed immediately, the military began loading the prisoners into trucks. While plaintiff was queued behind his brothers, a man began calling the names of the convicted. Id. at 57:18-58:2.

> Q. And what happened when the man who was calling the names called out the names of each of your brothers and then you?
> A. First they call my brothers. Then they call me.
> Q. And then what?
> A. Then he ask me, "Where are you?" when he call my name. Then I said, "I'm here." Then he did cry a little bit. So then he have a pen, so he bite his pen.
> Q. And then after he bit his pen?
> A. So he called the person who was having the key, that we being handcuffed together, so he called the person who had the handcuff key. Then he say, you know, "Handcuff him and just keep him here."
> Q. Then what happened next?
> A. So they separate me from the rest -- they put me on side in front of the court -- inside the court. So the rest of the group, 40 or more, so they took to the truck.

Id. at 58:25-59:16.

The truck drove away, and sometime later, plaintiff heard the sound of gun shots. Id. at 59:1-23. Thirty minutes after the truck had left, it returned carrying none of the prisoners, but the soldiers held numerous empty handcuffs. Id. Plaintiff never saw his brothers, or any of the men sentenced that day, again. Id. After watching soldiers load the truck with another group of convicted prisoners and convincing a guard that he was one of

the few released prisoners, plaintiff slipped away. Id. at 60:4-11. Feeling ill and having been told that soldiers were looking for him, plaintiff hid at the homes of his uncles for two days and then left the city by foot. Id. at 60:21-61:9.

### 3. Ahmed Jama Gulaid

Plaintiff Gulaid, who testified through the assistance of an interpreter, was born in Hargeisa in 1950. From 1968 to 1988, he served in the Somali National Army. See Trial Tr. Vol. 1 at 134:25-135:6; Second Am. Compl. ¶ 61. On June 4, 1988, Gulaid, a member of the Isaaq clan, was stationed at the Hargeisa General Hospital when he was arrested by an Army captain and four military policeman, whose uniforms included red berets. See Trial Tr. Vol. 1 at 136:4-138:13, 144:6-14. He was taken to a military base where, by his estimate, there were 1,500 Army soldiers in camouflage carrying guns. Id. at 138:1-11. Army officers were being instructed to clean and hand over their weapons until they had all been disarmed. Id. at 139:11-20, 141:4-6.

The captain who had detained Gulaid removed a list from his pocket and began calling names. The first name belonged to plaintiff, who was instructed to stand inside a circle of military police who were wearing red berets. Id. at 140:20-141:13. Sixty-three names of Isaaq officers were called. As these 63 officers stood in the circle of red berets, weapons

were returned to the non-Isaaq military police. Id. at 141:7-12, 142:2-13. The 63 unarmed Isaaq officers were loaded into a truck and driven to a military police base, where they were divided into two cells. Id. at 143:1-145:21. In the distance, Gulaid could hear the bombardment of Hargeisa. Id. 153:11-20.

Soon after arriving at the base, the military police began pulling men out of the cells, tying groups of four men together with rope, and loading them into a truck. Id. at 145:22-146:17. After the truck departed, Gulaid could hear gunshots in the distance and was confident the men were being killed. Id. at 147:4-17. When his group of four prisoners was loaded into a truck, they were driven to a nearby site called Malko Dur-Duro. They were then forced to stand between two poles where six groups, each group consisting of four men tied together, had already been made to stand before officers with guns. Id. at 147:22-148:8, 149:21-150:15. Other officers were nearby to move dead bodies as they fell. Id. When the order was given to shoot Gulaid's group, the man to his right and two men to his left fell, pulling Gulaid down as well. Id. at 151:2-11. The commanding officer checked the fallen men, and announcing "[t]hey're still alive," ordered his policemen to "shoot them. Give them five bullets each." Id. at 151:12-15. At this point, Gulaid lost consciousness. Id. at 151:16-23. When he awoke, he was covered by the bodies of his now-deceased colleagues. He

climbed up and out of the pile of the dead, retrieved his shoes, which were still near the poles where he had been tied and shot, and made his way home. Id. at 152:4-153:20.

### 4. Aziz Mohamed Deria

Plaintiff Aziz, currently residing in Seattle, Washington testified that he was one of 11 children born in 1964 to a happy family in Hargeisa, Somalia. See Trial Tr. Vol. 1 at 65:25, 76:13-23; Second Am. Compl. ¶¶ 38-42. His father, decedent Mohamed, was a businessman and head of the Pepsi-Cola Bottling Company in Hargeisa. In 1981, Aziz was a student financially supported by his family. Trial Tr. Vol. 1 at 78:5-10.

That year, General Gaani of the Somali Armed Forces was placed in charge of the military sector that included Hargeisa. He began to impose his authority on the locals, including Aziz's teachers, many of whom were arrested without cause. Id. at 78:17-79:12. Aziz protested these arrests, and he witnessed the arrests of many fellow students and the harassment of their parents. Id. Aziz testified that he was "shocked" by the force used by the government because "[w]e were innocent students who had no weapons . . . yet we were crushed so badly by the military forces led by General Gaani and Samantar." Id. at 80:9-12. Fearing for his life, Aziz fled Somalia. After years of living abroad, he was in the United States when he learned that his father and brother had been killed.

In June 1988, the Somalia Armed Forces "launched an indiscriminate . . . aerial and ground attack on Hargeisa." Second Am. Compl. ¶ 39. Aziz's sister, Nimo Mohamed Dirie ("Nimo"), who now resides in Kuwait with her family, testified that before the attacks in 1988, Mohamed and Mustafa were successful businessmen who owned storage facilities, a hotel, and many houses. See Trial Tr. Vol. 1 at 64:22-65:1. She stated that although her family is Isaaq, they did not support either side of the conflict and that neither Mohamed nor Mustafa was an SNM or UFFO member. Id. at 66:11-16, 67:11-12. Nimo testified that when the war came to Hargeisa, the family was forced to remain indoors "all the time." Id. at 67:4-67:18. She heard shooting, rockets, and bombs and could frequently see armed Somali government soldiers outside the windows. Id.

On June 1, 1988, nine or ten soldiers came inside the house, pointing guns and searching the home. Id. at 68:4-69:9. Fewer than two weeks later, 12 government soldiers returned and forcibly took Mohamed, who was around 49 years old. Id. at 69:10-70:17. Later in the day, soldiers returned and took Mustafa, who was 22, and their cousin. Id. at 70:23-71:11. The soldiers came back a third time that day, taking Nimo, her eight remaining siblings, and her mother outside to a neighbor's fence, where they were questioned about their clan and threatened with execution. Id. at 71:12-73:17. At some point,

the family was loaded into a truck; they were later released without explanation. Id. Nimo never again saw Mohamed or Mustafa. Id. at 73:22-74:11. The family left Hargeisa in July 1988, two months after fighting there had started, for a refugee camp in Ethiopia where they lived for a year. Id. at 75:1-13. Nimo testified that when they left Hargeisa, she saw blood covering the ground and 50-60 dead bodies, and she smelled a pervasive bad odor. Id. at 74:3-24.

## C. Secondary Liability

The seven claims for relief in the second amended complaint allege that defendant is liable for the harms suffered by plaintiffs under three theories of secondary liability: command responsibility, aiding and abetting liability, and joint criminal enterprise liability. The Supreme Court recently affirmed that "the TVPA contemplates liability against officers who do not personally execute the torture or extrajudicial killing." Mohamad v. Palestinian Auth., 132 S. Ct. 1702, 1709 (2012)(citation omitted). Even before Mohamad, "virtually every court to address the issue" has "recogniz[ed] secondary liability for violations of international law since the founding of the Republic." Aziz v. Alcolac, Inc., 658 F.3d 388, 396 (4th Cir. 2011)(internal quotation marks and alterations omitted); accord Doe VIII v. Exxon Mobil Corp., 654 F.3d 11, 19 (D.C. Cir. 2011)(citing The Presbyterian Church of Sudan v. Talisman, 582

F.3d 244, 258–59 (2d Cir. 2009); <u>Khulumani v. Barclay Nat'l</u>
<u>Bank</u>, 504 F.3d 254, 260 (2d Cir. 2007)(per curiam); <u>Sinaltrainal</u>
<u>v. Coca-Cola Co.</u>, 578 F.3d 1252, 1258 n.5 (11th Cir. 2009),
<u>abrogated on other grounds</u>, <u>Mohamad</u>, 132 S. Ct. at 1706 & n.2).

For command responsibility to apply, three elements must be
established:

> (1) [A] superior-subordinate relationship between the
> defendant/military commander and the person or persons
> who committed human rights abuses; (2) the
> defendant/military commander knew, or should have
> known, in light of the circumstances at the time, that
> subordinates had committed, were committing, or were
> about to commit human rights abuses; and (3) the
> defendant/military commander failed to take all
> necessary and reasonable measures to prevent human
> rights abuses and punish human rights abusers.

<u>Chavez</u>, 559 F.3d at 499 (holding that "command responsibility
does not require proof that a commander's behavior proximately
caused the victim's injuries")(citing <u>Ford v. Garcia</u>, 289 F.3d
1283, 1288 (11th Cir. 2002)); <u>see also</u> <u>Hilao</u>, 103 F.3d at 776-79
(same); <u>see generally</u> <u>Doe v. Qi</u>, 349 F. Supp. 2d 1258, 1329
(N.D. Cal. 2004)("The principle of command responsibility that
holds a superior responsible for the actions of subordinates
appears to be well accepted in U.S. and international law in
connection with acts committed in wartime . . . .") (citing <u>In</u>
<u>re Yamashita</u>, 327 U.S. 1, 14-16 (1946)).

The <u>Chavez</u> test accords with the legislative history of the
TVPA, which explains that a "higher official need not have

26

personally . . . ordered the abuses in order to be held liable."
S. Rep. No. 102-249, at 9 (1991). Rather, "[u]nder international
law, responsibility for torture, summary execution, or
disappearances extends beyond the person or persons who actually
committed those acts —- anyone with higher authority who
authorized, tolerated or knowingly ignored those acts is liable
for them." Id.

Plaintiffs also allege that defendant aided and abetted his
officers in carrying out violations of international law. See
Second Am. Compl. ¶¶ 95, 104, 114, 124, 134, 143, 152. "[A]iding
and abetting liability is well established under the ATS." Aziz,
658 F.3d at 396. In this circuit, "for liability to attach under
the ATS for aiding and abetting a violation of international
law, a defendant must provide substantial assistance with the
purpose of facilitating the alleged violation." Id. at 401. Put
another way, "the ATS imposes liability for aiding and abetting
violations of international law, but only if the attendant
conduct is purposeful." Id. at 390.

Plaintiffs' final basis for secondary liability is the less
developed doctrine of joint criminal enterprise, which is the
"[international law] analog to a conspiracy as a completed
offense." Presbyterian Church of Sudan, 582 F.3d at 260 (citing
Hamdan v. Rumsfeld, 548 U.S. 557, 611 n.40 (2006)). An
"essential element of a joint criminal enterprise is 'a criminal

intention to participate in a common criminal design.'" <u>Id.</u>
(assuming without deciding that plaintiffs could assert such a
theory in an ATS action)(quoting <u>Prosecutor v. Tadic,</u> Case No.
IT-94-1-A, Appeal Judgment, ¶ 206 (July 15, 1999)). Providing "a
theory of liability for proving a specific crime," the doctrine
"considers each member of an organized criminal group
individually responsible for crimes committed by the group
within the common plan or purpose, and it requires an overt act
in support of the offense." <u>United States v. Hamdan</u>, 801 F.
Supp. 2d 1247, 1285-86 (U.S.C.M.C.R. 2011)(explaining that joint
criminal enterprise is "not a stand-alone substantive offense").

   The uncontested evidence supports imposing secondary
liability. As First Vice President and Minister of Defense from
January 1980 through December 1986, Samantar was the leader of
the Somali Armed Forces and was the primary military figure in
Barre's military regime. Having participated in the 1969 coup,
he remained the leader of Somalia's military apparatus and a
close confidante of Barre until 1991.

   As Prime Minister, Samantar was in command during the
Hargeisa bombing of 1988 and admitted he was himself in Hargeisa
in June of 1988 when the major crimes against the civilian
population occurred. Pls.' Ex. 5. In 1989, as Prime Minister of
Somalia, Samantar traveled to London to meet Prime Minister
Margaret Thatcher and the British foreign affairs secretary.

During that diplomatic trip, BBC reporter Elizabeth Ohene conducted an in-person interview with Samantar at his London hotel and recorded that interview, which was conducted in English. Trial Tr. Vol. 1 at 88:13-90:16 (Ohene bene esse deposition authenticating recording of Samantar interview). During the interview, Samantar acknowledged his leadership role in the attacks on Hargeisa:

> Ohene: Prime Minister, yesterday we had a call to our office from people that you might call dissidents and they say that last year's total mayhem, chaos, at Hargeisa airport was a result of operations ordered by you personally.
> Samantar: I was there at that time, but I was not the commander of the unit. I was the higher ranking person in Hargeisa; therefore, it was necessary those commanders to [sic] consult with me and to have [sic] directions from myself. As you know, the top person in the area of conflict should give the last okay. Yes, I give this okay. How to use tactically, how to employ the units; it was my task to give them directions and directives.

Pls.' Ex. 5 (transcript of Pls.' Ex. 2A, audio recording of Ohene-Samantar interview).

Samantar's admission during that interview accords with the expert opinion of Colonel Kenneth Culwell, a former Defense Intelligence Agency attaché reporting to the United States Ambassador in Somalia, who testified to the command structure of the Barre regime and the mass destruction he observed in 1990, the year he spent in Somalia:

> Q: What role would the highest-ranking military
> officer in Somalia play in the shelling of a major
> city within Somalia?
> A: He would most likely approve it or authorize it.
> Given, however, the scarce resources in Somalia, he
> would have to allocate resources to it . . . .

Trial Tr. Vol. 1 at 106:18-22.

There was also evidence from Colonel Yousuf Sharmarke

("Sharmarke") who in May 1988 overheard President Barre

communicating through the Somali Armed Forces' radio system with

"General [] Samantar [who] was – military-wise . . . of higher

rank than the President . . . ." Trial Tr. Vol. 2 (Feb. 24,

2012, Dkt. No. 358) at 164:5-165:25 (reading of Sharmarke's

deposition testimony). Sharmarke testified that Barre and

Samantar were discussing the fighting between SNM and the Somali

Armed Forces in the town of Burao, which was still filled with

civilians:

> A: General Mohamed Ali Samantar received the
> communication that the SNM was fighting from within
> the people, the position – the decision reached by
> Mohamed Ali Samantar was to use heavy - artillery to
> drive the SNM out of town. I heard [Barre] . . .
> saying Samantar, Samantar, Samantar," concern with
> that -- that might not be in order. . . . Samantar,
> don't be quick in bombarding the town, and Samantar
> said, Samantar saying it was -- it is must that we do
> that.

Id. at 166:5-24. This testimony demonstrates the authority that

Samantar exerted with respect to military strategy and command

over the Armed Forces. Sharmarke also overheard Samantar himself

order Colonel Kahiye of the Somali Armed Forces to carry out the

heavy artillery attack. Id. at 178:9-179:6.

During Sharmarke's deposition, defense counsel pointed out

that Samantar was not the defense minister in May 1988, but

Sharmarke testified that Samantar remained the functional head

of Somalia's military:

> A: He was transferred from that post there afterwards,
> but Samantar had many other roles to play. He was the
> deputy of the National Security Committee, which was
> the biggest post. He was the prime minister, second
> decision-maker, and he was the expert in the act of
> war, the only one in Somalia. Whenever there was
> equipment, he was the one who used to take over that,
> and most of the time he was successful.
> Q: Isn't it true that under the Somali Constitution,
> it is the President who is the commander-in-chief of
> the Armed Forces, not the prime minister?
> A: He was initially, but when he was - but when he was
> elected, the chairman of the Socialist Party of
> Somalia, he gave -- he gave that role -- he passed
> that to Samantar. He left -- he no longer used the
> uniform of the army -- the army uniform. He put aside
> the army uniform, and from there Samantar took over.
> And when the war and the conflicts, that was the duty
> of Samantar.

Trial Tr. Vol. 2 at 174:9-175:1.

In light of Samantar's own words, Culwell's testimony, and

Sharmarke's deposition testimony, the three elements of the

command responsibility test outlined in Chavez — a

superior/subordinate relationship, the superior's knowledge of

the subordinate's abuses, and failure by the superior to take

reasonable measures — are clearly met. Samantar's subordinates

in the Somali Armed Forces and affiliated intelligence and

security agencies were committing human rights abuses; Samantar not only knew about this conduct and failed to take necessary and reasonable measures to prevent it, but he in fact ordered and affirmatively permitted such violations. The well-pleaded allegations and uncontested evidence submitted at trial also sufficiently establish that Samantar "substantial[ly] assist[ed]" his subordinates with "the purpose of facilitating" the acts alleged in the second amended complaint. See Aziz, 658 F.3d at 401. Accordingly, plaintiffs have established secondary liability with respect to the claims alleged by plaintiffs.[11]

### D. Damages

Credible, unrebutted testimony introduced at trial demonstrates that plaintiffs have suffered the harms alleged and are entitled to recover damages under the ATS and TVPA. See, e.g., 28 U.S.C. § 1350 note sec. 1(a); Ditullio v. Boehm, 662 F.3d 1091, 1096-98 (9th Cir. 2011)(holding that because the TVPA "creates a cause of action that sounds in tort" and explicitly allows a victim to "recover damages," both compensatory and punitive damages are available); Arce, 434 F.3d at 1256 (upholding jury verdicts for plaintiffs who sued defense ministers and military general on a command responsibility theory for their abductions and torture by soldiers).

---

[11] Because command responsibility and aiding and abetting are well-established, liability predicated on joint criminal enterprise need not be addressed.

32

It is hornbook law that uncertain, contingent, or speculative damages may not be recovered. It is equally true that "[a]n injured party is not barred from a reasonable recovery merely because he is unable to prove his damages with absolute certainty." Thompson v. Bhd. of Sleeping Car Porters, 367 F.2d 489, 493 (4th Cir. 1966). Surveying the cases calculating compensatory and punitive damages under the ATS and/or TVPA, one district court found six factors that weighed heavily in decisions across the circuits: the brutality of the act; the egregiousness of defendant's conduct; unavailability of a criminal remedy; international condemnation of the act; general deterrence; and interest in providing redress to plaintiff, his country and the world. Saravia, 348 F. Supp. 2d at 1158-59 (collecting cases and awarding $5 million in compensatory and $5 million in punitive damages for claims of extrajudicial killing and crimes against humanity). Damages in cases under the relevant statutes vary widely. See, e.g., Abebe-Jira v. Negewo, 72 F.3d 844, 846 (11th Cir. 1996)(upholding award to three plaintiffs for $200,000 each in compensatory damages and $300,000 each in punitive damages for torture and cruel, inhuman, and degrading treatment by former Ethiopian government official); Licea, 584 F. Supp. 2d at 1363-66 (awarding over $20 million to each plaintiff for human trafficking and forced labor conspiracy).

33

## 1. Compensatory Damages

Compensatory damages are recoverable for physical and psychological injuries. See, e.g., Mehinovic v. Vuckovic, 198 F. Supp. 2d 1322, 1358-59 (N.D. Ga. 2002)(awarding damages based on testimony by plaintiffs about the abuses and isolation they suffered and their continued "nightmares, difficulty sleeping, flashbacks, anxiety, difficulty relating to others, and feeling abnormal"); Licea, 584 F. Supp. 2d at 1364-65 (awarding damages based on testimony by plaintiffs as to physical injuries, lack of medical care, and psychological trauma suffered).

Plaintiffs in this case did not produce evidence of special damages, such as bills for medical or therapeutic treatment or any costs directly associated with the deaths of relatives, but they provided credible and compelling testimony of cognizable injuries stemming from the alleged violations. See Hilao, 103 F.3d at 793 (holding that plaintiff who had waived any claim to special damages could have his claim for pain and suffering, based only on his own testimony, submitted to the jury). Specifically, Yousuf testified that he endured torture and seven years of imprisonment, largely in solitary confinement. See Tr. Vol. 1 at 37:7-38:14; see also Second Am. Compl. ¶¶ 29-31, 36, 110-119 (Claim III). He testified that the imprisonment and torture has had long-lasting effects on his memory and emotional health. He suffers from depression and nightmares and still re-

lives the feeling of pacing the five-step length of his cell. See Tr. Vol. 1 at 37:7-38:14.

Baralle was tortured and, for unknown reasons, barely escaped the execution that in all likelihood befell his two brothers, decendents Abdullahi and Cawil. See Trial Tr. Vol. 1 at 61:13-61:21; see also Second Am. Compl. ¶¶ 110, 120, 133, 139-47, 148-55 (Claims III, IV, V, VI, VII). Baralle testified that he continues to suffer effects of the Somali Armed Forces' acts. He experiences pain and an occasional shaking on the left side of his body as well as flashbacks. Trial Tr. Vol. 1 at 61:13-61:21. Following the extrajudicial killings of his two brothers, he and his family took responsibility for raising the brothers' children. Id. at 61:22-62:7.

Targeted by a military police firing squad, plaintiff Gulaid lacked even the perfunctory process that was afforded to Yousuf and Baralle in their trials; ultimately, he escaped death thanks to what appears to be the executioner's error. See Second Am. Compl. ¶¶ 110, 120, 130, 139, 148 (Claims III, IV, V, VI, VII). Gulaid testified that he continues to suffer the emotional effects of his near-death experience. He has nightmares, flashbacks, and anxiety. Trial Tr. Vol. 1 at 153:22-154:5. He also suffers from memory loss, high blood pressure, and poor vision, which he attributes to the experience. Id. at 154:6-154:10. Finally, the testimony of plaintiff Aziz and his sister

35

Nimo presents compelling circumstantial evidence of the extrajudicial executions of their father Mohamed, the family's breadwinner and a successful businessman, and their brother Mustafa.

Calculating the appropriate amount of damages in cases such as this one is indisputably a difficult task. See Mushikiwabo v. Barayagwiza, No. 94cv3627, 1996 WL 164496, at *2 (S.D.N.Y. Apr. 9, 1996). In light of the testimony and evidence submitted as well as the range of awards to plaintiffs who have suffered similar harms, each plaintiff suing in his individual capacity will be awarded a sum of $1 million for pain and suffering while the estates of each of the four decedents will be awarded a sum of $1 million for each decedent.

### 2. Punitive Damages

Plaintiffs also entered evidence to show that "defendant's conduct was intentional, malicious, wanton, and reckless," justifying punitive damages. Trial Tr. Vol. 2 at 190:1-190:5. Although punitive damages are typically governed by state law, to comply with due process, the Fourth Circuit requires courts to consider four factors when assessing any such award:

- Proportionality, meaning that "any penalty imposed should bear a relationship to the nature and extent of the conduct and the harm caused" in light of "the reprehensibility of the conduct, the harm caused, the defendant's awareness of the conduct's wrongfulness, the duration of the conduct, [] any concealment," and the amount of the compensatory damage award;

- Penalties already imposed, such as other criminal or civil sanctions or any other punitive damages award arising out of the same conduct, which should be mitigating factors in the punitive damages calculation;
- Improper profits and the plaintiff's costs, to deprive the defendant of profits improperly derived and to ease the burden on the plaintiff of prosecuting the claim; and
- Limitations on a defendant's ability to pay, given that punitive damages are intended to punish but "not effect economic bankruptcy."

Mattison v. Dallas Carrier Corp., 947 F.2d 95, 110 (4th Cir. 1991). Punitive damages are commonly awarded in cases under the ATS and TVPA. See, e.g., Paul v. Avril, 901 F. Supp. 330, 336 (S.D. Fla. 1994)(awarding $4 million in punitive damages per plaintiff because "the acts committed by the defendant were malicious, wanton, and oppressive" and the award "must reflect the egregiousness of the defendant's conduct, the central role he played in the abuses, and the international condemnation with which these abuses are viewed").

Keeping in mind these factors, an award of $2 million in punitive damages to each individual plaintiff and the four estates is appropriate. This amount is intended to reflect the seriousness of Samantar's uncontested conduct and to ease any burden on plaintiffs in having to bring this case, while also recognizing the substantial compensatory damages awarded and the lack of evidence that Samantar possesses profits from his wrongful conduct that should be disgorged. The sum also takes into consideration Samantar's financial condition, specifically

37

his ongoing Chapter 7 bankruptcy proceeding.

### III.    CONCLUSION

For the above-stated reasons, a total judgment of $21 million, consisting of $1 million in compensatory damages and $2 million in punitive damages for the three individual plaintiffs and four represented estates, will be entered against defendant. The execution of the judgment will be stayed pending resolution of defendant's bankruptcy proceedings; however, the time for appeal of the Court's decision runs from the entry of the Order accompanying this Memorandum Opinion.

Entered this 28th day of August, 2012.

Alexandria, Virginia

                                                    /s/
                                    _____
                                    Leonie M. Brinkema
                                    United States District Judge